UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL NO. 19-CR-251 (RDM) |
| v. : | |
| : | |
| ANDRA VANCE, : | |
| : | |
| DEFENDANT. : | |

## UNITED STATES' TRIAL BRIEF

The United States of America (hereinafter "the Government") submits this trial brief to assist the Court in the trial of this matter, which begins on November 2, 2022.

### I. The Indictment

On July 25, 2019, a federal grand jury returned a two-count indictment against the Defendant, Andra L. Vance, a former Metro Transit Police Department (MTPD) officer, for crimes related to his use of force against D.C. at the Anacostia Metro Station (metro station) in Washington, D.C., on February 16, 2018. (Dkt. 1). Counts One and Two charge the Defendant with willfully depriving D.C. of his right to be free from an unreasonable seizure, which includes the right to be free from the use of unreasonable force by a law enforcement officer, which included the use of a dangerous weapon and resulted in bodily injury, in violation of 18 U.S.C § 242. *Id*. Count One alleges that the Defendant struck D.C. with a baton multiple times in the head without legal justification. *Id.* at 1. Count Two alleges that the Defendant used his baton to choke D.C. without legal justification while D.C. was on the ground. *Id*. at 2.

### II. The Evidence

#### A. The Unjustified Use of Force

On February 16, 2018, the Defendant used force against D.C. without legal justification. The Defendant was assigned to foot patrol at the Anacostia Metro with his partner, MTPD officer

David Ulrich. At approximately 8:30 a.m., D.C. attempted to use a metro senior fare card that did not belong to him. A Washington Metropolitan Area Transit Authority (WMATA) employee confiscated the senior fare card from D.C. and he became angry. When the Defendant stepped in and explained to D.C. that he would not be getting the senior fare card back, D.C. directed his anger toward the Defendant and Ulrich. This exchange occurred at the locked emergency exit gate. The Defendant and Ulrich stood on the paid side of the gate and D.C. stood on the unpaid side. D.C. stepped away briefly from the emergency gate, took off his jacket, returned with his fists clenched, shook the locked gate, and continued to demand the fare card. D.C. put his jacket back on and walked around to the unpaid side of an ADA fare gate. The Defendant met D.C. at the ADA fare gate and Ulrich followed closely behind.

As the Defendant approached the ADA fare gate, he extended his metal baton at his side. At the time that the Defendant extended his metal baton, D.C. was facing the Defendant at the ADA gate. The Defendant pushed through the closed ADA gate that separated him and D.C. and swung his metal baton once, striking D.C. in the head. At the time that the Defendant struck D.C., D.C. was backing away from the Defendant and the fare gate. Prior to the initial strike, D.C. did not lunge at the Defendant, spit at the Defendant, raise his fists at the Defendant, attempt to strike the Defendant, strike the Defendant, use a weapon against the Defendant, or threaten the use of a weapon against the Defendant.

D.C. then ran out of the metro station and the Defendant followed closely behind, continuing to swing his metal baton at D.C.'s head and neck area. Ulrich ran after the Defendant and D.C.—eventually catching up with them as they exited the metro station at Howard Road. Outside the metro station, the Defendant and Ulrich took D.C. to the ground. The Defendant used his baton to choke D.C. while he was lying on his back on the pavement and while Ulrich was

attempting to place D.C. into handcuffs. The Defendant continued to choke D.C. and a pool of D.C.'s blood began to pool underneath his head. D.C. was turned to his stomach and the Defendant pressed his baton on the back of D.C.'s neck. Ulrich then placed D.C. in handcuffs. The Defendant radioed to MTPD dispatch that D.C. had a head injury and requested a medic. D.C. was treated on scene and transported to Howard University Hospital where he was treated for a four-inch laceration to his head that required multiple staples to close.

### B. The Surveillance Video

Former MTPD Chief Ronald Pavlik was monitoring the radio at the time that the Defendant requested a medic for D.C.'s head injury. Pavlik, concerned about the head injury, immediately requested that then-Sergeant Daniel Alvarez of the Office of Professional Responsibility and Inspections (OPRI) pull all video surveillance from the metro station where the use of force occurred. Pavlik and Alvarez reviewed the relevant surveillance video in the hour following the Defendant's use of force. Four separate surveillance videos, that do not have audio captured portions of the Defendant's use of force against D.C. including: (1) a view of the gates from the unpaid side; (2) a side view of the fare gates; (3) the exit door of the metro station at Howard Road; and (4) outside the metro station at Howard Road.[1] The initial interaction between the Defendant and D.C. at the emergency exit gate, however, is not captured on surveillance video.

### C. MPTD Use of Force General Order

MTPD General Order (G.O.) 130 "establishes the parameters of force available to [officers]." *MTPD General Order* 130 (eff. Jan. 19, 2012). The G.O. defines use of force as "[t]he amount of effort required by the police to compel compliance of an unwilling subject." *See MTPD*

---

[1] The Government has also disclosed enhanced copies of the surveillance videos that capture the use of force. The Defendant has moved to exclude this evidence at trial. (Dkt. 88).

*G.O. 130* at 1. Less-lethal force is defined as "force that is unlikely to cause death or serious injury, but the possibility of a fatality, however remote, does still exist." *Id.* Lethal force is defined as "force likely to kill or cause serious injury." *Id.*

An officer's "decision to use force of any degree must be based upon information known by the [officer] at the time of the encounter." *Id.* Officers "will determine the amount of force that is necessary to overcome the resistance they encounter." *Id.* MTPD officers are given "options that [they] may use when confronted with a use of force situation." *Id.* Those options include: (1) officer presence; (2) verbal commands; (3) non-aggressive control holds; (4) issued oleoresin capsicum (O.C.); (5) less-lethal equipment; (6) active counter measures; (7) impact weapons; and (8) lethal force. *Id.* MTPD officers "may use lethal force only when they reasonably believe that the action is in defense of human life, including the [officer's] own life, or in defense of any person in imminent danger of serious physical injury." *Id.* at 3. Under the G.O., "[c]ontrol holds, applied to an individual's neck, that are intended to compress either the trachea or carotid arteries are prohibited." *Id.* at 2. Finally, the G.O. requires all officers to (1) "notify their supervisor without delay each time force is used"; and (2) complete a "comprehensive Use of Force Report … as soon as possible." *Id*. at 3.

### D. The Defendant's Use of Force Report

Although the Government may or may not choose to introduce it, the Defendant completed a Use of Force Report that was, at a minimum, misleading. When describing the initial baton strike, the Defendant stated that D.C. "came to the ADA gate with his fist clinched," and demanded his card back "or [the Defendant should] be ready to fight," and the Defendant "met [D.C.] with his baton extended and attempted to strike [D.C.] in the arm, and in an attempt to avoid the strike, D.C. moved and the blow hit him in the left side of the head."  The Defendant failed to document

4

(1) the additional baton strikes to D.C.'s head and neck area as he chased D.C. out of the metro station; and (2) his choking of D.C. outside the metro station. Instead, the Defendant merely stated that D.C. "attempted to flee and was subdued after a struggle." The surveillance video contradicts the Defendant's Use of Force Statement.

### E. The Defendant's Law Enforcement Training

At the time of the use of force, the Defendant had been an MTPD officer for more than 14 years. In addition to the basic law enforcement training that the Defendant received at the academy regarding arrests, pursuits, weapons, use of force tactics, and report writing, he received MTPD training that reinforced these principles. The Government will present evidence of the training the Defendant received regarding Fourth Amendment use of force principles, as well as his training on proper MTPD procedure related to the use of force in general and the use of the ASP baton specifically.

### F. Expert Witness Testimony

The Government seeks to present expert testimony pursuant to Federal Rule of Evidence (FRE) 702 through: (1) former MTPD Chief Pavlik; (2) MPTD Captain Daniel Alvarez[2]; and (3) former MTPD Officer Brent Boone regarding use of force principles and defensive tactics. Should these witnesses be permitted to testify in their expert capacities, they will testify about police procedures, protocols, and training regarding use of force that law enforcement officers in MTPD and around the country must follow. They will also explain when law enforcement officers are permitted to use deadly force. Finally, they will testify that the Defendant's conduct throughout

---

[2] The Government filed its motion *in limine* to introduce the lay and expert testimony of Pavlik and Alvarez. (Dkt. 105). The Government submits that their testimony can be properly admitted as hybrid lay and expert witness testimony with appropriate limiting instructions. (Dkt. 105 at 14-19). The Defendant opposes Pavlik and Alvarez's testimony as expert witnesses and as hybrid lay and expert witnesses. (Dkt. 114 at 4-6).

his encounter with D.C. is inconsistent with training and policy and will provide factual testimony that allows the jury to infer intent. *See United States v. James*, 737 F. Supp. 2d 1, 6 (D.D.C. 2010) ("Hence, the expert would have testified that evidence, such as weapons, scales, and large amounts of cash, found in the defendant's home were consistent with an intent to distribute, not that this defendant actually had an intent to distribute. This testimony would be entirely consistent with Federal Rule of Evidence 704(b), which only prohibits an expert witness from testifying as to whether a particular defendant did in fact have such intent.") (internal citations omitted). The Government will not elicit testimony as to the ultimate issue that in their opinions the defendant had the requisite intent. *See United States v. Lorenzana-Cordon*, 2016 WL 11664056, at *3 (D.D.C. Feb. 12, 2016).[3]

### 1. *Former MTPD Chief Pavlik*

Former MTPD Chief Pavlik was hired as an MTPD officer in 1995 and spent approximately 26 years with MTPD where he served at every rank. Finally, he served as MTPD chief for approximately eight years before retiring. As part of his duties as chief, Pavlik made the final disciplinary and employment decisions for officers who were accused of policy violations, including for the excessive use of force. During the course of his law enforcement career, Pavlik

---

[3] The Government maintains, as described in its motion *in limine* (Dkt. 105 at 10, 12-14), that these witnesses, as well as MTPD Officer Ulrich and MTPD Sergeant Salicia Belton can also provide lay opinion testimony regarding their direct observations and experiences related to the Defendant's use of force against D.C. *See United States v. Robinson*, 2017 WL 2636517, at *1–3 (D.D.C. June 15, 2017); *Westfahl*, 2015 WL 13697453, at *2 (D.D.C. July 24, 2015) ("[T]o the extent that the officers testify based on their personal observations of the event, Federal Rule of Evidence 701 permits them to say whether they believed the defendants acted reasonably or whether they believed the force used was excessive"); *United States v. Umbach*, 708 F. App'x 533, 545 (11th Cir. 2017) (no error where officer testified that use of force was not justified based on his personal observation of the attendant circumstances and his training and experience). The Defendant opposes the introduction of Pavlik, Alvarez, Belton, and Ulrich's lay opinion testimony. (Dkt. 114 at 6-11).

has received training and has on-the-job experience regarding when officers are authorized to use force according to the prevailing legal standards, as well MTPD policies. Pavlik will testify that MTPD officers are trained to escalate force to meet a threat. Pavlik will also explain that once a suspect is no longer a threat, officers are trained to deescalate force. Pavlik will testify that if officers use force, they are required to articulate and justify that force in an MTPD Use of Force Report and although officers have a variety of options when using force, choke holds are expressly prohibited. Finally, he will testify that the Defendant's use of force against D.C. was inconsistent with training and policies.

### *2. MTPD Captain Daniel Alvarez*

Captain Alvarez was hired as an MTPD officer in 2007 and has also held the ranks of detective, sergeant, and lieutenant. During the course of his law enforcement career, Alvarez has received training and has on-the-job experience regarding when officers are authorized to use force according to prevailing legal standards, as well MTPD policies. Notably, the Defendant was assigned as Alvarez's Field Training Officer (FTO) and provided him on the job training early in his career. In February 2018, Captain Alvarez was a sergeant in the OPRI Unit where he specifically investigated police officer misconduct, including allegations of excessive use of force. Alvarez will testify that he had concerns about the force that the Defendant used against D.C. He will testify that, based on the video, Alvarez did not observe an overt threat from D.C. and there were gates between the Defendant and D.C. at the time that the Defendant deployed his baton. Alvarez will testify that the Defendant's use of force against D.C. was inconsistent with training and policies. Additionally, Alvarez will testify that he reviewed the Defendant's MTPD reports documenting the force he used and found the sequence of events in the Defendant's report were inaccurate because the Defendant (1) reported that he swung for the left side of D.C.'s arm which

was not observable on the video; (2) omitted the choke; and (3) used a vague term of "brief struggle." Alvarez will testify that MPTD officers are trained to include and document all force used and that the Defendant's use of force report was inconsistent with MTPD training and policies.

### 3. Former MTPD Officer Brent Boone

Mr. Boone has 25 years of experience in law enforcement. He is a professional instructor and police trainer who has been certified by the Commonwealth of Virginia and the Maryland Police Training Commission. Mr. Boone was a Training Coordinator for MTPD's Training Division where he was responsible for providing (1) defensive/control tactics training, which includes baton training, to every new recruit class of MTPD from 2011 to 2021; and (2) annual in-service training for approximately 350 sworn police officers of MTPD. Here, Mr. Boone will testify about police procedures, protocols, and training regarding use of force that law enforcement officers at MTPD and around the country must to follow. Specifically, Mr. Boone will testify about MTPD training regarding deployment of the ASP baton and the types of strikes that are permitted. He will testify that, throughout all of the baton swings, the Defendant used the same technique—one that MTPD does not train officers to use and one that has the potential to serious injure or kill someone. Mr. Boone also will explain when law enforcement officers are permitted to use deadly force. Finally, he will testify that the Defendant's actions during his use of force against D.C.—in particular the manner in which he used his baton to strike D.C. in the head and neck area—were inconsistent with training and policies.

### III. The Elements of the Charged Offenses and Legal Analysis

Counts One and Two of the indictment charges a violation of 18 U.S.C. § 242. The elements of § 242 that the United States must prove beyond a reasonable doubt are that the

Defendant (1) acted under color of law; (2) deprived the victim of a right secured by the Constitution of the United States; and (3) acted willfully. *See* 18 U.S.C. § 242; *see also United States v. Pindell*, 336 F.3d 1049, 1053 n.1 (D.C. Cir. 2003); *United States v. Lanier*, 520 U.S. 259, 264 (1997) ("Section 242 is a Reconstruction Era civil rights statute making it criminal to act (1) willfully and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States.") (internal quotations and citation omitted).

To establish a felony offense under § 242, the United States must also prove behind a reasonable doubt that (4) the victim sustained bodily injury, or the offense involved the use, threatened use, or attempted use of a dangerous weapon. *See* 18 U.S.C. § 242.

### A. Color of Law

The evidence presented at trial will establish beyond a reasonable doubt that the Defendant acted under color of law. To act under "color of law" means to act under some form of State-sanctioned authority. *West v. Atkins*, 487 U.S. 42 (1988); *Griffin v. Maryland*, 378 U.S. 130, 135 (1964). Whoever acts in his official capacity, or by virtue of the power conferred to him by the State, acts under color of law. *See Screws v. United States*, 325 U.S. 91, 111 (1945); *Williams v. United States*, 396 F.3d 412, 414 (D.C. Cir. 2005) ("The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. Courts generally treat under color of law as the same thing as the state action required under the Fourteenth Amendment.") (internal quotations, citations, and alterations omitted).

The United States does not anticipate that the Defendant will dispute that he was acting under color of law when he used force against D.C. At the time of the use of force, the Defendant was working in his official capacity as an MTPD officer while on foot patrol and in full uniform

9

at the metro station. Thus, the Government will establish beyond a reasonable doubt that he acted under color of law.

### B.  Deprivation of a Constitutional Right

Counts One and Two implicate D.C.'s Fourth Amendment right to be free from unreasonable seizure. *See* U.S. CONST. AMEND. IV. Here, the evidence will show that the Defendant seized D.C. and acted unreasonably. A person is "seized" for Fourth Amendment purposes when "by means of physical force or show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980); *see Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (stating a seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied"); *United States v. Veney*, 44 F.4th 403, 405 (D.C. Cir. 2022) ("For purposes of the Fourth Amendment a seizure occurs when physical force is used to restrain movement or when a person submits to an officer's show of authority."); *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person, and the Fourth Amendment requires that the seizure be reasonable." ) (internal citations and quotations omitted). The evidence presented at trial through witness testimony and video evidence will demonstrate that the Defendant "seized" D.C. when he struck D.C. in the head multiple times with his baton, took him to the ground, and choked him.

The Government will also prove beyond a reasonable doubt that the Defendant used excessive force during the seizure of D.C. Whether an officer used excessive force during a "seizure" is evaluated under the Fourth Amendment's "reasonableness" standard, *Graham v. Connor*, 490 U.S. 386, 388 (1989), by asking whether the officers' actions were "objectively reasonable" in light of the facts and circumstances confronting him at the time, *id.* at 397. "The

'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* at 396. "Careful attention" must be paid "to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Courts also consider "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted." *Johnson v. D.C.*, 528 F.3d 969, 973–74 (D.C. Cir. 2008) (internal quotations, citations, and alterations omitted). "An officer's act of violence violates the Fourth Amendment's prohibition against unreasonable seizures if it furthers no governmental interest, such as apprehending a suspect or protecting an officer or the public." *Hall v. D.C.*, 867 F.3d 138, 157 (D.C. Cir. 2017) (internal quotations, citations, and alterations omitted).

As a preliminary matter, the evidence at trial will show that throughout his encounter with D.C., the Defendant used lethal force against D.C. when he did not a pose threat, let alone a deadly one. The "facts and circumstances" of this case indicate that the Defendant deprived D.C. of his Fourth Amendment right to be free from the use of unreasonable force by a law enforcement officer by using more force than was reasonably necessary. Further, the evidence will show that the Defendant's use of force was unreasonable when he (1) struck D.C. in the head with his baton at the ADA gate; (2) continued to strike D.C. in the head and neck area as D.C. fled from the metro station on foot; and (3) choked D.C. with his baton outside the station.

11

Although D.C. was angry and used profanity[4] towards the Defendant and Ulrich at the locked emergency exit gates previously, D.C. posed no threat to the Defendant or anyone else at the time that he struck D.C. in the head with his baton. Despite the Defendant's claim—which is not supported by other witness testimony—that D.C. had his fists clenched as he approached the ADA gate, D.C. did not lunge at the Defendant, spit at the Defendant, raise his fists at the Defendant, attempt to strike the Defendant, strike the Defendant, use a weapon against the Defendant, or threaten the use of a weapon against the Defendant. At the time that he struck D.C. in the head with the baton, as demonstrated by witness testimony and corroborated by the surveillance video, and as further reflected in his Use of Force Report, the Defendant had no information or knowledge of D.C.'s mental or psychiatric condition, any violent or criminal history, combative skills, or access to weapons, or whether he was under the influence of drugs or alcohol. The Defendant and D.C. were separated by the ADA gate next to his partner, Ulrich, just prior to the Defendant's initial baton strike. Significantly, the Defendant—not D.C.—closed the distance between the two when he pushed through the ADA gate and struck D.C. in the head with his metal baton. Based on these facts, the Defendant did not need to strike D.C. with the baton in order "protect [himself] and/or others from harm." *MTPD General Order 130*, at 1 (rev. Jan. 19,

---

[4] During the encounter at the locked emergency gate, neither the Defendant nor Ulrich used force against D.C.—which was appropriate given the circumstances. Based on their training, they are not permitted to use force merely because a citizen directs anger—even profanity laden anger—towards them. *See Wood v. Eubanks*, 25 F.4th 414, 423 (6th Cir. 2022) ("Further, both the Supreme Court and this court have made clear that police officers ... are expected to exercise greater restraint in their response than the average citizen. Police officers are held to a higher standard than average citizens, because the First Amendment requires that they 'tolerate coarse criticism.'") (internal quotations and citations omitted); *Payne v. Pauley,* 337 F.3d 767, 776 (7th Cir. 2003) ("In fact, the First Amendment protects even profanity-laden speech directed at police officers. Police officers reasonably may be expected to exercise a higher degree of restraint than the average citizen and should be less likely to be provoked into misbehavior by such speech.") (internal citations omitted); *Thurairajah v. City of Fort Smith, Arkansas*, 925 F.3d 979, 985 (8th Cir. 2019) ("Criticism of law enforcement officers, even with profanity, is protected speech.").

2012). Moreover, the Defendant did not "reasonably believe that the [baton strike was] in defense of human life, including [his] own life, or in defense of any person in imminent danger of serious physical injury." *Id.* at 3. Similarly and for the same reasons stated above with respect to the initial baton strike, D.C. did not pose any threat to the Defendant or others when he (1) struck D.C. in his head and neck area as D.C. ran out of the metro station; or (2) choked D.C. with his baton outside the station. Thus, under the totality of the circumstances, a reasonable officer would determine the Defendant's use of force—both less-lethal and lethal—against D.C. to be excessive.

Finally, the expert testimony of Mr. Boone, as well as former MTPD Chief Pavlik and MTPD Captain Alvarez, if permitted, will assist the jury in determining whether the Defendant's use of force against D.C. was excessive. Their testimony will be limited to the industry standards for judging whether the amount of force used was appropriate. *See Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 27 (D.D.C. 2007) ("Of course, there is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the defendants' performance in light of those standards.") (internal citations omitted). Their testimony will demonstrate that law enforcement officers are trained to use force and that deadly force, as was used in this case, is only permitted in a limited number of circumstances. Additionally, their testimony will show that the Defendant's actions during his use of force against D.C., and the omissions in his MTPD use of force report, were inconsistent with his training and MTPD policies.

### C. Willfulness

The Government will also establish beyond a reasonable doubt that the Defendant acted "willfully." A willful constitutional violation is one committed with the specific intent "to deprive a person of a right which has been made specific either by the express terms of the Constitution or law of the United States or by decisions interpreting them," *Screws*, 325 U.S. at 104, or "in open

defiance or in reckless disregard of a constitutional requirement which has been made specific and definite," *id.* at 105; *see also United States v. Ehrlichman*, 546 F.2d 910, 920, (D.C. Cir. 1976) (explaining *Screws*). A defendant acts with the requisite specific intent if he acts with a bad purpose, that is, knowing his actions are wrong, with the effect of violating a clearly established constitutional right. *See Lanier*, 520 U.S. at 259. A defendant need not specifically intend the resulting constitutional deprivation, as long as he intended to commit the act, the act resulted in a constitutional deprivation, and he knew what he was doing was wrong. *See Screws*, 325 U.S. at 106. Willfulness can be established through circumstantial evidence. *See United States v. Cowden*, 882 F.3d 464, 474 (4th Cir. 2018) ("Willfulness [in a § 242 case] may be shown by circumstantial evidence, provided that the defendant's purpose reasonably may be inferred from all the connected circumstances.").

Here, the evidence will prove beyond a reasonable doubt that the Defendant acted willfully when he struck D.C. in the head and choked him with his baton. D.C. did not pose a threat to the Defendant at the ADA gate and the Defendant violated MTPD policies and training when he struck D.C. in the head with his baton. According to MTPD policy and training, the Defendant impermissibly used deadly force against D.C. in this instance. Once D.C. fled on foot—still not posing a threat to the Defendant—the Defendant continued to use lethal force against D.C. when he swung his baton multiple times in D.C.'s head and neck area. Throughout all of the baton swings, the Defendant used the same technique—one that MTPD does not train officers to use and one that has the potential to serious injure or kill someone. Further, the Defendant violated MTPD policies and training when he choked D.C. while he was on the ground bleeding from his head posing no threat to the Defendant. Again—the Defendant impermissibly used lethal force against D.C. Throughout this course of conduct, the Defendant repeatedly violated MTPD policy

throughout his encounter with D.C. and his actions are evidence of willfulness. *See United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) ("If, as here, an officer has been trained that officers should not do several things when confronted with tense situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully.").

Should the Government introduce the Defendant's MTPD Use of Force Report, it will show that he omitted crucial details of the force he used against D.C. including that he (1) continued to swing his baton at D.C.'s head, neck, and shoulder area as he chased him out of the metro station; and (2) choked D.C. with his baton outside the metro station. These omissions provide circumstantial evidence of willfulness. Therefore, the Government will be able to demonstrate that the Defendant acted willfully.

### D.  Bodily Injury or Dangerous Weapon

Finally, the evidence presented at trial will establish beyond a reasonable doubt that the Defendant's actions constitute a felony offense, because (1) D.C. suffered "bodily injury"; and (2) the Defendant used a "dangerous weapon." *See* 18 U.S.C. § 242. The Government does not anticipate that the Defendant will dispute that he used a deadly weapon to strike and choke D.C. or that D.C. suffered bodily injury.[5]

Section 242 does not define bodily injury; however, courts have adopted the standard set out in Title 18. *See United States v. Myers*, 972 F.2d 1566, 1572–73 (11th Cir. 1993) (bodily injury includes a cut, abrasion, bruise, burn, disfigurement, or physical pain). The Government must prove only that D.C. suffered an injury to the body, even if the injury was minor or temporary,

---

[5] As of the date of this filing, the parties have been unable to reach a stipulation to medical testimony and therefore, the Government anticipates presenting evidence of the injuries that D.C. sustained and the medical treatment that received through one or more medical professionals.

15

including pure physical pain. *Id.* at 1572 (approving jury instruction). Here, D.C. suffered bodily injury when the Defendant struck D.C. in the head area multiple times with his baton and choked D.C. with his baton. D.C.'s injuries were apparent on scene and captured on the surveillance video, as well as through photographic evidence. D.C. was treated on scene and transported to Howard University Hospital. D.C. sustained a four inch laceration to his head that required 10 staples. Therefore, the Government will be able to establish that the Defendant's conduct resulted in bodily injury to D.C.

Alternatively, a § 242 violation is a felony offense if the act committed in violation of the statute "include[d] the use, attempted use, or threatened use of a dangerous weapon." 18 U.S.C. § 242. A "dangerous weapon" is "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. § 1B1.1 (App. Note 1(E)(i)). The Defendant used his baton to strike and choke D.C. Metal batons—especially when used to strike someone in the head or choke them—are inherently dangerous. *See United States v. Swallow*, 891 F.3d 1203, 1205 (9th Cir. 2018) ("[A]n object that is not inherently dangerous can constitute a dangerous weapon if the defendant used the object to augment the force of the assault, in a manner capable of inflicting serious bodily injury."). Thus, the Government will be able to establish that the Defendant used a dangerous weapon during his assault on D.C.

### IV. Anticipated Trial Issues

While the parties have briefed multiple issues in motions in *limine*, in anticipation that the below issues may arise, the Government notes the following to aid the Court.

#### A. Evidence Related to D.C.

The Government does not intend to call D.C. as a witness at trial and submits that the following types of evidence are therefore not relevant or admissible. First, evidence regarding

D.C.'s mental health has been the subject of numerous motions *in limine* (Dkts. 15, 20, 27, 62 & 84) hearings (Dkts. 41 and 83) before the Court. The medical records make references to D.C.'s psychiatric history.[6] The Government submits that this issue is now moot because (1) D.C. is not going to testify at trial; and (2) there is no evidence that the Defendant or any other witness was aware of or even suspected that D.C. suffered from any mental health issues at the time of the assault. Therefore, the Defendant should be precluded from raising D.C.'s mental health during trial. *See United States v. George*, 532 F.3d 933, 936 (D.C. Cir. 2008) ("Mental illness is relevant only when it may reasonably cast doubt on the ability or willingness of a witness to tell the truth.") (quoting *United States v. Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996) (internal quotations omitted).

Additionally, the parties have litigated the admissibility of D.C.'s criminal convictions at length. (Dkts. 15, 27, 30 & 63). During a pretrial hearing on February 3, 2021, the Court granted the Government's motion to exclude D.C.'s convictions older than 10 years and deferred ruling on D.C.'s more recent convictions. (Dkt. 83 at 45). Additionally, at a March 3, 2020 pretrial hearing, the Court noted that it did not "see how … [D.C.'s] criminal record is relevant unless [the Defendant] was aware of it, and that somehow his defense is that some knowledge of that in his view justified his actions." [Dkt. 41 at 22-23). Here, because D.C. is not going to testify and there is no evidence that the Defendant knew of D.C.'s criminal history and that he considered D.C.'s criminal history when using force against D.C., this Court should exclude any reference to D.C.'s criminal history.

Similarly, the Defendant should be precluded from introducing the results of D.C.'s toxicology report from Howard University Hospital. Neither the Defendant nor any other witness

---

[6] The Government has disclosed the relevant reports that contain D.C.'s diagnoses and prescribed medication and will not enumerate them in this filing to protect D.C.'s privacy.

has claimed that D.C. appeared to be under the influence at the time of the assault. Evidence regarding D.C.'s toxicology report could not make the existence of a fact of consequence to the determination of this case more or less probable. Because D.C. will not testify at trial, the results of his toxicology report could only be offered for the purpose of prejudicing, misleading, or confusing the jury. Therefore, the toxicology report is inadmissible under FRE 401.

Finally, the Defendant should be precluded from referring to the civil settlement that D.C. and WMATA reached. The settlement, for an undisclosed amount, arose from the same circumstances that form the basis of the indictment. The settlement would be relevant as to D.C.'s potential bias if he testified. However, because D.C. is not going to testify, and evidence of the settlement is not otherwise admissible under FRE 401, any reference to the civil settlement should not be permitted.

### B. Defendant's Hearsay Statements

The parties have briefed the issue of the admissibility of the Defendant's oral hearsay statements. (Dkts. 119, 120 & 121). The Defendant made oral statements about the force that he used force against D.C. over the MTPD radio and to MTPD personnel while on scene and at Howard University Hospital where D.C. was treated for his injuries. (Dkt. 119 at 1-2). The Government anticipates that the Defendant may attempt to introduce these statements during his opening statement, on cross-examination of the Government's witnesses, or during direct examination of his witnesses. These oral statements—like Defendant's MTPD Use of Force Report—are only admissible if and when offered by the Government (as a party opponent) pursuant to FRE 801(d)(2) and should be otherwise excluded. *See United States v. Jordan*, 810 F.2d 262, 264 (D.C. Cir. 1987) ("Appellant's own incriminating statements were, of course, party admissions, and therefore not hearsay.").

### C. The Defendant's Prior Uses of Force

The Government's initial FRE 404(b) notice (Dkt. 22) has been the subject of numerous filings by the parties (Dkts. 26, 29, 67, 73, 78, 84, 103, 106 & 117) and pretrial status conferences (Dkt. 41 & 83).[7] Specifically, the Government seeks to introduce evidence that the Defendant used force against arrestees in 2008 and 2014 and that MTPD determined that the force that he used was in violation of policy. (Dkt. 103 at 2-4). The Government seeks to introduce the proffered FRE 404(b) evidence to demonstrate that the Defendant's conduct was willful in violation of 18 U.S.C. § 242 and to rebut the claims (1) he lacked knowledge with respect to MTPD policy and use of force principles; and (2) his actions were an accident or mistake. *See United States v. Proano*, 912 F.3d at 439 (7th Cir. 2019). Disciplinary action against the Defendant is particularly relevant to show the Defendant's awareness of MTPD policy on the use of force and the importance of abiding by it, and is therefore plainly relevant to the reasonableness (or lack thereof) of the Defendant's actions at issue here. If permitted to introduce this evidence at trial, the Government anticipates presenting evidence from each incident through a single witness.

### D. The Defendant's Expert Witnesses

The Defendant noticed two experts—Mr. Trevor Hewick and Dr. Desmoulin—and the Government moved *in limine* that their testimony be excluded. (Dkt. 90, 98 & 104). In sum, the Government submitted that the witnesses' testimony includes impermissible legal conclusions, inadmissible self-serving hearsay statements purportedly made by the defendant, and scientifically unfounded factual speculation that bears no relation to any fact at issue in the current case. *Id.* The Court granted the Government's request for a *Daubert* Hearing with respect Dr. Desmoulin only,

---

[7] To date, the parties have been unable to reach a stipulation regarding the FRE 404(b) evidence.

which is currently scheduled for October 24, 2022. The Government's motion *in limine* with respect to Mr. Hewick is scheduled to be heard on the same date.[8]

The United States respectfully files this brief this 19th day of October, 2022.

                                **KRISTEN CLARKE**
                                **ASSISTANT ATTORNEY GENERAL**

By:      */s/ Maura White*
            MAURA WHITE
            Trial Attorney
            Civil Rights Division, Criminal Section
            IL Bar No. 6289336
            950 Pennsylvania Ave, NW, 4CON
            Washington, D.C. 20530
            (202) 532-3827

                                **MATTHEW M. GRAVES**
                                **UNITED STATES ATTORNEY**

By:      */s/ Gauri Gopal*
            GAURI GOPAL
            PA Bar No. 306-718
            Assistant United States Attorney
            601 D Street, N.W.
            Washington, D.C. 20001
            Telephone: (202) 730-6624
            E-mail: gauri.gopal@usdoj.gov

---

[8] In the event that the Court permits Mr. Hewick's testimony at trial, the Government withdraws its opposition to the Defendant's request that Mr. Hewick be permitted in the courtroom during trial testimony pursuant to FRE 615(b). (Dkts. 89 & 96). The Government would seek permission to allow Brent Boone to be permitted in the courtroom during Mr. Hewick's testimony. The Defendant has no objection to this request.